FILED

2014 MAR 18 PM 3: 49

CLERK U S DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY____

Nathaniel Kelly, SBN 262016
Law Offices of Nate Kelly
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA 90210
Telephone: 310-228-6215
Facimilie: 310-228-6216
Email: esquire@natekelly.com

Attorney for DreamStone Entertainment, LTD.
and Tigris Entertainment, LLC

## IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

#### WESTERN DIVISION

**CV14-2063 CAS (SSx)**

| | |
|---|---|
| DREAMSTONE ENTERTAINMENT LTD., AND TIGRIS ENTERTAINMENT, LLC, | Civil Action No. |
| | COMPLAINT FOR: |
| | (1) Breach of Contract; |
| | (2) Fraud |
| *Plaintiffs,* | (3) Breach of Fiduciary Duty |
| | (4) Intentional Interference with Prospective Economic Relations |
| v. | |
| MAYSALWARD, INC., a Delaware Corporation; | (5) Negligent Interference with Prospective Economic Relations |
| NOUR KHRAIS, an individual; | |
| and DOES 1 -10, | (6) Money Had and Received |
| | (7) Trademark Infringement |
| *Defendants.* | (8) Copyright Infringement |

**(9)  Trade Secret Misappropriation**

**(10)  Conversion**

**(11)  Unfair Competition**

**(12)  Accounting**

**(13)  Piercing the Corporate Veil**

**JURY TRIAL DEMANDED**

Plaintiffs DreamStone Entertainment Ltd. ("DreamStone") and Tigris Entertainment, LLC ("Tigris") (collectively, "Plaintiffs") make the following allegations against Maysalward, Inc. ("MD" or "Maysalward") and Nour Khrais ("Khrais") (collectively, "Defendants"):

## PARTIES

1.  Plaintiff DreamStone is a United Kingdom limited company having a principal place of business at 30 Faraday House, 1 Velocity Way, Enfield Lock, Middlesex, EN3 7FE, United Kingdom. DreamStone has appointed Lewis Sarmed Alsamari, 30 Faraday House, 1 Velocity Way, Enfield Lock, Middlesex, EN3 7FE, United Kingdom, as its agent for service of process.

2.   Plaintiff Tigris is a California Limited Liability Company with its principal place of business at The Colorado Center, 2500 Broadway, Building F, Suite F-125, Santa Monica, California 90404.  Tigris has appointed Lewis Sarmed Alsamari, as agent for service of process.

3.   On information and belief, MD is a Delaware corporation with its principal place of business at The King Hussein Business Park, Building 24, Amman, Jordan. MD has appointed VCorp Services, LLC, 1811 Silverside, Wilmington, DE 198104345, as its agent for service of process.

4.   On information and belief, Khrais is an individual and resident of Jordan.  He may be served at his place of business, The King Hussein Business Park, Building 24, Amman, Jordan, or wherever he may be found.

### JURISDICTION AND VENUE

5.   The Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. § 100 et seq., copyright jurisdiction, 28 §§ 1338 (a) and (b), and federal question jurisdiction, 28 U.S.C. § 1331.

6.   The court has subject matter jurisdiction over this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and federal question jurisdiction, 28 U.S.C. § 1331.

7.   This court has subject matter jurisdiction over this action pursuant to diversity jurisdiction, 28 U.S.C. § 1332. The

amount in controversy exceeds $75,000 exclusive of interests and costs and proper diversity exists between Defendants and Plaintiff.

8.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

9.   Venue is proper in this court pursuant to 28 U.S.C. §§ 1391(b)-(c). Further venue is appropriate because the Agreements entered into by the parties, and at issue in this litigation, establishes the jurisdiction of the federal and state Courts inside of California for any matter arising out of or relating to the Agreements. Further, Defendants accepted California as the state of jurisdiction knowing that Plaintiff DreamStone was based in Los Angeles County, California.

## General Allegations

10.   This case arises from Defendants' systematic campaign of fraud and deception designed and methodically executed to deprive DreamStone and Tigris of their valuable intellectual property, earned money, and reputation related to the production and distribution of "GHUL: 1001 Arabian Nights." ("Game")

11.   Lewis Alsamari began developing the Game in April 2013. Lewis—along with a team of graphic designers and other professionals—spent countless hours developing voiceovers, graphics, artwork, storylines, and other intellectual property

for the game. ("Game Content") Alsamari-owned Tigris Entertainment originally owned all of the intellectual property in regards to the Game Concept. Over the course of developing and promoting the Game, Lewis Alsamari expended over $270,000 on behalf of the Plaintiffs.

12. Lewis Alsamari and his team had substantial plans for "GHUL" from the start. Lewis had already begun developing the "GHUL" franchise by copyrighting a movie script and engaging a comic book artist before even meeting Nour Khrais or engaging with Maysawlard for Game production.

13. Lewis copyrighted drafts of his movie script for GHUL: 1001 Arabian Nights in December 2012, February 2013, and July 2013. Prior to meeting Nour Khrais, Tigris had already been in active negotiations with multiple Hollywood companies regarding the finance and production of the "GHUL" film franchise.

14. While both the potential film partners and comic book artists expressed their keen interest in working with Lewis and investing significant money in Tigris' respective projects, the film partners and comic book artists wanted to evaluate revenues from the Game prior to beginning respective movie and comic book productions.

15. Alsamari and Defendant Nour Khrais originally met through a mutual acquaintance. On April 21, 2013, Nour, on behalf of Maysalward, agreed to sign a non-disclosure agreement with

original GHUL rights' holder, Tigris, to gain access to the GHUL Game Concept. Nour and Alsamari then began negotiating an agreement to allow Maysalward to develop the Game Concept into a fully functioning video game. ("Finished Game"). Nour's main duty was to develop the code ("Code") and make the Game Concept into a Finished Game. Nour had no other foreseeable obligations to develop any other intellectual property pertaining to the Finished Game.

16.   Nour Khrais came away immediately impressed with the GHUL game concept, but expressed his reluctance to enter into a written contract with Tigris regarding game development and confidentiality. This was the first sign of trouble.

17.   Tigris, however, refused to enter into an agreement to develop the game without a contract establishing its basic rights under the contract. Khrais—knowing that Lewis and Tigris would not proceed with a development deal otherwise—finally agreed to sign a contract establishing the roles and rights of the parties in regards to publishing the Game. ("Tigris Development Agreement"). Tigris and Maysalward executed two contracts, a "Non-disclosure and Non-Circumvention Agreement" (Exhibit A) and "Commission, Development, and Assignment Agreement," (Exhibit B) on April 25th and May 3rd, 2013, respectively. The Tigris Game Development Agreement specifically

required Maysalward to "design and develop [the Finished Game] and to Assign all intellectual property therein to [Tigris]."

18.  Following the Tigris Agreements' execution, 1821 Media expressed their keen interest in partnering up with Tigris for the GHUL movie.  Lewis decided to set up a new entity named DreamStone Entertainment to own all intellectual property rights pertaining to the Game; Tigris would continue to own all other intellectual property related to GHUL not directly affiliated with the Game.

19.  Khrais agreed to the new entity formation plan, believing that forming the new entity would both make the GHUL movie more attractive to 1821 Media.  Khrais also knew—from this point onwards—that the Game needed to attract significant downloads and revenue to ensure 1821 Media's finance and production of the GHUL movie.  Khrais would later consistently leverage this information, through implicit threats of taking the down or improperly marketing game, to advance his negotiating position with Lewis following the Game's launch.

20.  Khrais—despite providing immediate attention to all other matters between the parties—continually dodged DreamStone's requests to execute either a non-disclosure agreement or game development agreement.  After several unsuccessful efforts to obtain Maysalward's execution, the parties finally entered into a "Commission, Development and Assignment Agreement" for Game

production on August 15, 2013.   While Khrais executed the game development agreement on August 15, 2013, he failed to deliver the document to DreamStone until September 5, 2013.   Khrais—through constant acts of deception—has never executed the non-disclosure agreement provided by DreamStone.

### Commission, Development and Assignment Agreement

21.  At all relevant times, Defendant Khrais acted as the primary negotiator and figurehead for Maysalward.   Khrais is an experienced developer in the gaming industry and has entered numerous contracts with similarly situated, inexperienced game developers in the same shoes as DreamStone.

22.  Maysalward and DreamStone, entered into a "Commission, Development, and Assignment Agreement" ("Assignment Agreement,") with an Appendix pertaining specifically to GHUL ("Game Agreement") (collectively, "Agreements," attached as Exhibit C) on August 15, 2013.  Under the Agreements, Maysalward agreed to "design, develop and co-publish [the Game] and to assign all intellectual property rights therein to owner" in exchange for fifty percent of net profits generated from publishing the Finished Game.   The Agreements defined Net Profits as "gross profits received by any App Store and paid into Developer's Account, less any commissions or fees deducted by App Store." The Agreements notably did not provide for any deduction in net

profits for MD's expenses related to building marketing for building the Game.   The Agreements also included a confidentiality clause, stipulating that all communications regarding game design, game ideas and strategy were to be kept confidential.

23.   The Agreements also required Maysalward to:

(a)   Account for all net profits

**(b)**   Provide DreamStone with access to revenue reports, including password access on developer sites; and

**(c)**   Distribute fifty percent of net profits to DreamStone ("Plaintiff's Net Profits") within seven days of receiving the same.

24.   The Agreements additionally granted DreamStone the right to reinstate the Finished Game in the event Maysalward breached the Agreements by failing to (1) pay DreamStone net profits within seven days of collection; or (2) provide DreamStone revenue reports.

25.   Pursuant to the Agreements, Plaintiff and Defendants jointly launched the game on Monday October 14, 2013.

<u>**Defendant's Never Abides by the Agreements' Explicit**</u>

<u>**Provisions**</u>

26.   Defendants ignored their obligations under the Agreements immediately following project launch.   Defendants—at no time whatsoever—have  (1)  paid  any  of  Plaintiff's  Net  Profits;  (2)

provided comprehensive reports indicating revenue attributable to the Game; or (3) assigned any intellectual property rights in the Game to DreamStone. Defendants currently hold the Finished Game hostage, disallowing DreamStone from reinstating the game and mitigating their loss in revenue.

27. Alsamari, Tigris and DreamStone entered their respective Agreements with the intention to create a long-lasting partnership with Maysalward and Khrais. Khrais repeatedly emailed Alsamari to fortify the notion that he and Maysalward were entering the Agreements as amicable partners of the respective parties, as displayed in the following Nour Khrais email excepts:

> April 24th, 2013: "[We] are believer[s] in [a] long
> term partnership. Lets do it and harvest success
> together."

> May 2nd, 2013: "Regarding the Support question in
> contract. It can continue after the 8 week. By end of
> the day [we] is having this project as [a] Win-Win
> partnership."

> August 17th, 2013: "Inshallah [God Willing] we will
> make it together a Success."

August 19th, 2013: "I am taking it with me for sure (Games-com is this week) and will make unofficial business about it.. I think the game need to be teased well with Facebook and interviews we talked about, did you have the chance to print something out so you can start making interviews about it…etc .."

August 22nd, 2013: "I had a meeting today with my friend who is leading the Game Division in the second biggest TV in Germany ProSiben and we agreed to work together on Maysalward game including Ghul. Will need to do a German localization with Voice over and text but he needs to test with his team this week.."

August 22nd 2013:"They loved the game and the story .. I think we are getting it right bro.."

August 23rd 2013:"Hello!  Do u think that you can have a voice over in Arabic!? We can push Apple Middle East to feature it but we need Arabic interfaces for it."

28.  With such assurances, Khrais coaxed DreamStone into commissioning additional voiceover work to launch an Arabic

version of the Game; and (2) providing Khrais with more concepts for game development.

29. These assurances also forestalled DreamStone's initial concerns about non-payment of Plaintiff's net profits and access to revenue reports after successful Game launch. After months of non-payment, however, DreamStone could no longer sit patiently while its "partners" failed to live up to their basic contractual obligations.

30. After never gaining access to revenue reports and not seeing a dime of net profits attributable to the Finished Game sales, DreamStone emailed Khrais to demand revenue reports and his share of profits. In response Khrais shamelessly responded: "Yes sure we are a team and partners . . . Happy to build on it for the future…."

31. Between October 2013 and February 2014, Khrais continually fabricated reasons for failing to pay DreamStone Plaintiff's Net Profits, provide access to revenue reports, provide assignment of intellectual property rights, and provide DreamStone with a copy of the Finished Game.

32. While fabricating reasons for failing to abide by its basic contractual obligations, Defendants proactively disabled DreamStone's access to any reports, including reports regarding general performance of the game, to keep DreamStone in the dark about the Game's economic and logistical performance.

### DreamStone Confronts Defendant

33. After months of failing to comply with their contractual obligations, DreamStone confronted Khrais about Maysalward's failure to pay net profits or provide revenue reports.

34. In a January 12th, 2014 email, DreamStone demanded that Maysalward follow the Agreements by granting it access to all revenue reports and an accounting of all revenues attributable to the Game. Maysalward failed to provide a suitable response and forced Dreamstone to retain current counsel, Nathaniel Kelly.

35. On January 24, 2014, Nathaniel Kelly sent a demand letter to Khrais and Maysalward to either: (1) abide by its contractual obligations; or (2) provide the Finished Game to DreamStone to allow for reinstatement and further economic exploitation, as provided under the Agreements.

36. Instead of providing the requested information or reinstatement pursuant to the Agreements, Defendants immediately and unilaterally pulled the game off the market and promised to provide requested revenue reporting. Khrais indicated that he would remove all intellectual property owned by DreamStone in a veiled threat to re-launch a competing video game under his corporate umbrella. Plaintiffs have learned that Khrais began pitching the game's technology to third party competitors during this time period.

37.   Khrais, instead of immediately sending the promised reports, emailed shoddy reports with little to no useful one week later. His email proved that he had lied once again—the reports glaringly omitted any information regarding Game revenue.

38.   At the time of this filing, Khrais and Maysalward have failed to provide DreamStone with any revenue payments, revenue reports, or assignment of intellectual property. They currently hold DreamStone's Game hostage in their headquarters in Jordan, disallowing Plaintiff from reinstating the game and mitigating damages. Khrais—despite knowing that Plaintiffs depended on Game performance to produce the GHUL movie and comic books—has refused to provide DreamStone with a copy of the Game.

39.   As a result of Maysalward's refusal to abide by its contractual obligations or even respectfully act as decent human beings, Plaintiffs have suffered significant and irreparable damages: DreamStone has no Finished Game to promote or generate revenues. Plaintiffs' tentative deals with movie and comic books have fallen apart. Plaintiffs—who entered the Agreements and partnership with dreams of big economic success—now owe more than $250,000 for the costs expended in developing the Game Concept and Khrais-requested voice over work. Defendants meanwhile continue to reap the fruits of their deceptive campaign and Plaintiffs' hard work and ingenuity.

## CLAIMS

### Count 1: Breach of Contract

40. Plaintiffs incorporate paragraphs 1–40 as if fully set forth herein.

41. The parties entered into the Agreements to form a business relationship under which the parties would be granted a share of profits in the partnership business, which was to co-publish, market and sell the Game. The parties agreed to an equal allocation of 50% net profits to Maysalward and DreamStone.

42. The Agreements required Maysalward to (1) deliver Plaintiff's Net Profits within seven days of receipt; (2) assign all intellectual property from the Finished Game's development to Plaintiff; (3) provide Plaintiff with Finished Game; (4) provide Plaintiff with password access to online revenue reports; (5) provide Plaintiff with revenue reports in the event access to online revenue reports were temporarily interrupted, but warranted to continue providing access thereafter to any and all revenue reports ; and (6) provide Plaintiff with the right to reinstate the Game on applicable platforms if Defendant breached the Contract.

43. Plaintiffs have performed all conditions, covenants, and promises required to it in accordance of the terms and conditions of the Agreements.

44.   All conditions required for Defendant's performance have occurred.

45.   Defendants' have breached the Agreements by:

a.   Failing to pay Plaintiff's Net Profits;

b.   Failing to provide Plaintiff intellectual property, or assignment of the same, arising from the Finished Game's development;

c.   Failing to provide Plaintiff with the Finished Game;

d.   Failing to provide Plaintiff with access to revenue reporting databases;

e.   Failing to provide Plaintiff with any original reports or authentic online screenshots regarding revenue;

f.   Holding the Finished Game hostage in its headquarters in Amman-Jordan to prevent Plaintiff from reinstating the Game pursuant to the Agreements.

46.   As a result of Defendants' breach of the Agreements, Plaintiffs has suffered damages, including, but not limited to: (1) out-of-pocket costs for Game concept development; (2) the lost revenue for the game being off the market after Defendant unilaterally took Game off the market; (3) loss of non-assigned intellectual property; (4) Plaintiff's Net Profits; (5) the loss of revenue caused by not having the game in its possession to reinstate it on all applicable platforms; (6) lost production of the GHUL movie and revenues therefrom; and (7) lost production

of the GHUL comic book and revenues therefrom.   Plaintiffs are entitled to damages in amount to be proven at trial.

47.  On information and belief, Khrais acted as the alter ego of Maysalward at all relevant times related to this cause of action. At all relevant times, such a unity of interest existed between Khrais and Maysalward that Maysalward ceased to have a separate corporate personality. At no time did Alsamari, Tigris or DreamStone deal with any other officer, staff member or individual affiliated with Maysalward other than Khrais. At all relevant times, Khrais acted as the sole figurehead of Maysalward as its owner, CEO, and sole negotiator. On information and belief, Maysalward failed to observe corporate formalities and failed to keep minutes or accurate records. On information and belief, Khrais has caused assets to be used for his own personal and business gain, including, but not limited to, Plaintiff's share of net profits owed under the Agreements. In essence, Maysalward was a mere shell and conduit for the fraudulent business practices of its owner, Nour Khrais.

48.  Adherence to the fiction of Maysalward's separate existence would permit an abuse of the corporate privilege and would sanction fraud and abuse. Therefore, Khrais should be deemed the alter ego of Maysalward and held personally liable on any and all debts owed to Plaintiff.

**Count 2: Fraud**

49.  Plaintiffs incorporate paragraphs 1-48 as if fully set forth herein.

50.  Defendants made repeated false promises and representations concerning the relationship between the parties, including:

    a. Defendants' intent to pay DreamStone 50% of net profits;

    b. Defendants' intent to provide DreamStone with access to live online revenue reports;

    c. Defendants' intent to provide DreamStone with revenue reports;

    d. Defendants' intent to provide Plaintiff with and assign all intellectual property arising from the Finished Game's development to DreamStone;

    e. Defendants' intent to deliver a finished Game to Defendant;

    f. Defendants' intent to keep confidential all discussions and ideas regarding future video game development for the purpose of partnering with Plaintiffs on game projects;

    g. Defendants' intent to act as Plaintiffs' "partners" in Game distribution; and

h. Defendant's intention to allow Plaintiff to re-launch the game in the event of Defendant's breach of contract.

51. On multiple occasions since the Game launch in October 2013, Khrais misrepresented that Defendants would (1) supply DreamStone with revenue reports; and (2) provide DreamStone with revenue within 7 days of Maysalward's receipt of revenues pursuant to the Agreements.

52. Khrais has wrongfully and deceitfully:

a. Induced Plaintiffs to provide Defendants with its intellectual property, specifically the Game Concept and other trade secrets;

b. Intentionally misrepresented his intentions to provide and assign all intellectual property rights arising from Game development to DreamStone with intellectual property right assignments;

c. Intentionally misrepresented that he would provide DreamStone with revenue reports or access to the same;

d. Intentionally misrepresented that he would provide Plaintiffs with access to the Finished Game;

e. Intentionally misrepresented that payments of net profits would be forthcoming;

f. Intentionally misrepresented that he would abide by the Agreements' confidentiality provisions;

g. Intentionally misrepresented that he would "partner" with Plaintiffs on additional and future game development to gain access to Plaintiffs' trade secrets and other intellectual property ("IP"); and

h. Intentionally diverted funds, on Plaintiff's information and belief, to other bank accounts for business and personal use;

53. Defendants made these false promises and misrepresentations with the intent to deceive and induce Plaintiff to (1) provide Defendants with the Game Concept, trade secrets, and other IP for their personal benefit; and (2) allow them exclusive access to revenue in order to wrongfully abscond with Plaintiff's Net Profits.

54. Plaintiffs relied on the misrepresentations, false promises and material omissions by providing Defendants with the Game Concept, a 50% share of net profits, and various other confidential information and trade secrets.

55. Defendants knew the falsity of the misrepresentations and promises at the time of the statements and had no reasonable ground to believe them as true. Defendants made the statements with the sole intent to deceive Plaintiffs and cause Plaintiffs to take the aforementioned actions.

56. Plaintiffs were unaware of the falsity of the promises and representations and took the actions stated above in

reliance on Defendants' statements.   Plaintiffs, in justifiable reliance on Defendants' false misrepresentations and promises, provided Defendants with years' worth of ingenuity and the costs of developing the Game Concept.

57.   Plaintiffs, in justifiable reliance on Defendants' false misrepresentations, also allowed and entrusted Defendants to have sole access to revenues attributable to Game publication.

58.   As a direct result of Defendants' fraud, Defendants have possession of the Game and have the ability to copy, sell or exploit the Game Concept and the Game, and infringe upon its copyrighted features.   Further, as a result of the fraud, Plaintiff has lost considerable time, effort and money it invested in the Game Concept and the relationship between the parties over the last year, as well as any revenue of the sales from the Game.

59.   Defendants' actions as alleged herein are fraudulent, malicious and oppressive and constitute despicable conduct in conscious disregard for Plaintiffs' rights.   Plaintiffs are therefore entitled to exemplary and punitive damages pursuant to California Civil Code Section 3294.

## Count 3: Breach of Fiduciary Duty (Duty of Good Faith and Loyalty)

60.   Plaintiffs incorporate paragraphs 1-59 as if fully set forth herein.

61. Defendants owed a fiduciary relationship to Plaintiffs derived from the joint venture established by the Agreements: Plaintiffs reposed a confidence in the integrity of both defendants, requiring Defendants to act with utmost good faith. These confidences, included but are not limited to: (1) access to Plaintiffs' valuable Game Concept, trade secrets, and other IP; (2) development and assignment of Code developed for the Game; and (3) authority to account and exclusive access to revenue attributable to the Game.. Defendants owed Plaintiffs a duty of loyalty and the duty to refrain from self-dealing, as set forth under California Corporations Code Section 16404.

62. On information and belief, Defendants acted in bad faith in a calculated attempt to circumvent and defeat the terms of the Agreements and deprive Plaintiffs of the benefits derived from the same.

63. On information and belief, Defendants took the above alleged actions for their own benefit and disregard to Plaintiffs', which Defendants should have protected and considered on an equal basis as their own.

64. As a proximate result of Defendants' breach, Defendants have deprived and will continue to deprive Plaintiffs of the benefits entitled to it under the Agreements. This breach has caused Plaintiffs to suffer damages in an amount determinable at trial.

65.   Defendants breached their duty of good faith through certain actions, including, but not limited to:

a. Refusing to provide Plaintiffs with any net profits;

b. Diverting funds for other uses;

c. Inducing Plaintiffs to provide the Game Concept, trade secrets, and other IP with intent to misappropriate the same for their own exclusive benefit;

d. Failing to disclose any financial information related to the relationship;

e. Not acting in the best interests of Plaintiffs;

f. Forcing Plaintiffs to request the game be taken off the market if Defendants failed to comply with obligations;

g. Unilaterally taking the Game off the market;

h. Making veiled threats to cease distributing the game to hinder Plaintiffs' tentative movie and comic book deals; and

i. Failing to provide Plaintiffs with a working Game for reinstatement of the Game following Defendants' breach of the Agreements.

66.   Defendants breached their duty of loyalty to Plaintiffs through certain actions, including, but not limited to:

a. Refusing to provide Plaintiffs with any net profits;

b. Diverting funds for their own uses;

c. Inducing Plaintiffs to provide the Game Concept, trade secrets, and other IP with an intent to misappropriate for their own beneficial use;

d. Failing to disclose any financial information related to Game;

e. Not acting in the best interests of Plaintiffs;

f. Forcing Plaintiffs to request the game be taken off the market if Defendants failed to comply with obligations;

g. Unilaterally taking the Game off the market;

h. Making veiled threats to cease distributing the game to hinder Plaintiffs' tentative movie and comic book deals; and

i. Failing to provide Plaintiffs with a working Game for reinstatement of the Game following Defendants' breach of the Agreements.

67. As a direct result of Defendants' breach, Defendants have deprived Plaintiffs and continues to deprive Plaintiffs of the benefits of the applicable Agreements. As result, Plaintiffs are entitled to all damages award for all harm that Defendants have caused—even unanticipated harm—in amount to be determined at trial.

68. Plaintiffs have and continue to be irreparably harmed by Defendants' breach of their fiduciary duties and Plaintiffs'

remedy at law is not adequate to compensate for the injuries inflicted by Defendants.

69.  It is impossible and impractical for Plaintiffs to enjoy the rights rendered under the Agreements while Defendants continually breach their fiduciary duties. Plaintiffs will continue to suffer irreparable harm from Defendants' breach unless equitable relief is granted and a constructive trust is formed to order Defendants' to compel the delivery of the Finished Game, all IP at issue, and revenue owed to Plaintiff.

## Count 4: Intentional Interference with Prospective Economic Relations

70.  Plaintiffs incorporate paragraphs 1–69 as if fully set forth herein.

71.  Defendants intentionally interfered with Plaintiffs' economic relationship with 1821 Media to finance and produce the GHUL movie that would have likely resulted in an economic benefit to Plaintiffs.

72.  Defendants knew about the relationship between 1821 Media and Plaintiffs, and knew that Plaintiffs depended on the game's successful performance and continued publication to allow for 1821 Media's agreement to finance and produce the GHUL movie.

73.  Despite knowing about the relationship, Defendants intentionally breached the Agreements, continually made misrepresentations, unilaterally and wrongfully ceased

publication of the Finished Game, and refused to provide Plaintiffs with the Finished Game as required under the Agreements.

74. As a result of Defendant's actions, Plaintiffs have suffered damages in an amount determinable at trial.

75. Defendants' conduct in committing the above actions is malicious and oppressive and constituted despicable disregard of Plaintiffs' rights and was intended to cause Plaintiffs' harm. Plaintiffs are therefore entitled to punitive and exemplary damages.

## Count 5: Negligent Interference with Prospective Economic Relations

76. Plaintiffs incorporate paragraphs 1-75 as if fully set forth herein.

77. Defendants negligently interfered with Plaintiffs' economic relationship with 1821 Media to finance and produce the GHUL movie that likely would have resulted in an economic benefit to Plaintiffs.

78. Defendants knew or should have known about the relationship between 1821 Media and Plaintiffs, and knew or should have known that Plaintiffs depended on the game's successful performance and continued publication to allow for 1821 Media's agreement to finance and produce the GHUL movie.

79. Despite knowing about the relationship, Defendants failed to act with reasonable care in regards to the Game by ceasing its publication and disallowing DreamStone from reinstating the Finished Game on applicable platforms.

80. Defendants engaged in wrongful conduct by intentionally breaching the Agreements, continually making misrepresentations, unilaterally and wrongfully ceasing publication of the Finished Game, and refusing to provide Plaintiffs with the Finished Game as required under the Agreements.

81. As a result of the aforementioned actions, the relationship between 1821 Media was disrupted, causing harm to Plaintiffs.

82. Defendants' wrongful conduct was a substantial factor in causing Plaintiffs' harm.

83. As a result of Defendants' actions, Plaintiffs have suffered damages in an amount determinable at trial.

### Count 6: Money Had and Received

84. Plaintiffs incorporate paragraphs 1-83 as if fully set forth herein.

85. Defendants are liable to Plaintiffs for money had and received because Defendants (1) received Plaintiff's Net Profits due to DreamStone; (2) have disallowed DreamStone from obtaining Plaintiff's Net Profits for its beneficial use as required under

the Agreements; and (3) have failed to provide DreamStone with any money as of the time of this filing.

86.  Defendants have caused Plaintiffs damages pursuant to this cause of action in an amount determinable at trial.

## Count 7: Trademark Infringement

87.  Plaintiffs incorporate paragraphs 1-86 as if fully set forth herein.

88.  Plaintiffs are entitled to trademark protection for "GHUL," and "DreamStone" and pursuant to 15 U.S.C. 1227(a). Specifically, Plaintiffs acquired applicable trademark protection because Plaintiffs were the first entities to use "GHUL" and "DreamStone" (collectively, "Trademarks") in commerce.

89.  Defendants were provided with the Trademarks on or about August 15, 2013 based on the agreement that Defendant would (1) develop code for the Finished Game; (2) market the product; (3) assign all intellectual property arising from the Finished Game's development to Plaintiffs; (4) provide Plaintiffs with access to revenue reports; and (5) provide Plaintiffs with Plaintiff's Net Profits.

90.  Because Defendants immediately breached the Agreements and had no intention to abide by its terms, Defendants never had a license to use Plaintiffs' Trademarks, and have infringed on Plaintiffs' Trademarks without permission, by copying,

producing, distributing, placing and selling the Finished Game that include Plaintiffs' trademarks.

91.   Defendants' distribution, marketing, promotion, offering for sale, and sale of the Finished Game bearing the Trademarks was likely to cause confusion, mistake, or deception as to the source, affiliation, sponsorship, or authenticity of the Finished Game and the distribution of the same. As a result of Defendants' unauthorized use of trademarks that are identical to Plaintiff's trademarks, the public is likely to believe that Defendants' distribution and removal of the Game was affiliated or approved by Plaintiffs.

92.   Defendants' unauthorized use of the Trademarks falsely represented that the Game and quality of distribution was approved and affiliated with Plaintiffs. Defendants' use of the Trademarks beyond Plaintiffs control disallowed Plaintiffs from controlling the quality of distribution and overall messages associated with the Trademarks and the Finished Game bearing those Trade Marks.

93.   Specifically, Defendants' unauthorized distribution of the Finished Game and subsequent action to disrupt the distribution of the game caused immense damages to Plaintiffs' reputation, Plaintiffs' goodwill (including injury to Plaintiff's business reputation), lost profits, the cost of

future corrective advertisement to correct public confusion, and the tentative movie and comic book deals described above.

94. Defendants' infringement of Trademarks was willful, intended to reap the benefit of the goodwill of Plaintiff, and violates Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

95. The removal of the Game from commerce has also caused great harm to Plaintiffs in the gaming community: Downloaders of the Game have continually contacted DreamStone seeking explanation regarding why it removed the game from relevant APP stores, resulting in a diminishment of DreamStone's public perception as a quality content manager and game distributor.

96. As a result of Defendant's wrongful conduct, Plaintiffs have suffered, and will continue to suffer, substantial damages. Under 15 U.S.C. § 1117(a) Plaintiffs are entitled to recover damages, including any and all profits Defendants have made as a result of their wrongful conduct.

97. Plaintiffs are further entitled to attorneys' fees and full costs pursuant to 15 U.S.C. § 1117(a).

**Count 8: Copyright Infringement (17 U.S.C. § _et seq._)**

98. Plaintiffs incorporate paragraphs 1-97 as if fully set forth herein.

99. Plaintiffs are entitled to copyright protection for both the Finished Game—including component codes and Game Concept—pursuant to the Agreements.

100. Plaintiffs are entitled to copyright protection for the Game Concept under Section 17 U.S.C. § 104.

101. Plaintiffs are entitled to copyright protection for the Code and Finished Game developed by Maysalward pursuant to 17 U.S.C. §§ 104, 204. Specifically, Plaintiffs are entitled to all copyrights in the Finished Game and Code because Defendants assigned DreamStone with the Finished Game and Code pursuant to the Agreements.

102. Defendants were provided with the Game Concept based on the Agreements stipulating that Defendant would (1) develop Code for the Game; (2) market the Game; (3) assign all intellectual property, including the code, arising from the Game's development to Plaintiffs; (4) provide Plaintiffs with access to revenue reports; and (5) provide Plaintiffs with 50% of net profits from sale of the game.

103. Because Defendants immediately breached the Agreements and had no intention to abide by its terms, Defendants have infringed on Plaintiffs' Code and Game Concept copyrights without permission, by copying, producing, distributing, placing and selling the Game that includes the copyrighted Codes and Game Concept.

104. On information and belief, Defendants have infringed on Plaintiffs' copyrights knowingly, deliberately and willfully.

105. As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to damages and Defendants' profits pursuant to 17 U.S.C. § 504(b) for each infringement. Plaintiffs are entitled to damages in an amount determinable at trial.

106. Plaintiffs are further entitled to attorneys' fees and full costs pursuant to 17 U.S.C § 505.

107. Plaintiffs are also entitled to an order compelling Defendants to provide a written account of, and delivery to Plaintiffs of all original and copies of the copyrighted Code, Game Concept, and Finished Game.

108. Unless enjoined by the Court, Defendants' conduct and continued use Defendants' conduct, as herein alleged, is causing and will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated with monetary damages unless enjoined and restrained by this Court. Pursuant to 17 U.S.C. § 502. Plaintiffs are entitled to preliminary injunction to prohibit further infringements of Plaintiffs' Game Concept and Code copyrights.

## Count 9: Trade Secret Misappropriation

109. Plaintiffs incorporate paragraphs 1-109 as if fully set forth herein.

110. Over a period in excess of 10 months and at significant expense, Plaintiffs developed the Game Concept, constituting a valuable trade secret.

111. Defendants acquired the Game Concept through improper misrepresentation, artifice and deceit as described above.

112. Defendants have also committed theft by failing to provide the Code applicable to the Game that was properly assigned to it through the Agreements.

113. Defendants' improper acquisition of the Plaintiffs' Game Concept and Code unjustly enriched Defendants to receive benefits they otherwise would not have received, including, but not limited to, the Code and all net profits. Additionally, Defendants received additional information by using Plaintiffs' valuable trade secrets—which constitute trade secrets in and of themselves—including, but not limited to, the following information (explicitly designated as confidential by the Agreements) related to the Game:

a.    Technical data and know how related to the Game;

b.    Statistics related to the Game launch;

c.    Service users of the Game;

d.    User join rates of the Game;

e.    Click rates of the Game; and

f.    Conversion rates of the game.

114. Defendants have failed to provide the above information related to the Game, despite their contractual obligation to do so and improper misappropriation.

115. On information and belief, Defendants plan on using this information to launch their own game to compete with Plaintiffs.

116. As a direct and proximate result of the misappropriation, Plaintiffs have suffered actual damages and Defendants have been unjustly enriched.

117. On information and belief, Plaintiffs allege that each of misappropriation willfully and maliciously, and therefore Plaintiffs are entitled to double damages pursuant to California Civil Code Section 3426.3.

118. Unless enjoined by this court, Defendants' conduct and continued use of misappropriated trade secrets will cause further great and irreparable injury. Plaintiffs therefore request that, after trial, the Court issue a permanent injunction, restraining Defendants and their agents, employees, attorneys, representatives and anyone acting at their direction or behalf from misappropriating, using, or disclosing, without the express or implied consent of Plaintiffs, Plaintiffs' proprietary information and trade secrets, including but not limited to those involved in the development, production, and distribution of the Game.

**Count 10: Conversion**

119. Plaintiffs incorporate paragraphs 1-118 as if fully set forth herein.

120. Plaintiffs own property rights in the share of the net profits paid to Defendants and the Finished Game under the Agreements.

121. Defendants wrongfully converted Plaintiffs' share of the money paid to Defendants. Defendants, on information and belief, have wrongfully converted Plaintiffs' share of money for their businesses and personal use.

122. Defendants have also intentionally and substantially interfered with Plaintiff's property by taking possession of and refusing to provide Plaintiff with a copy of the Finished Game in order allow for its reinstatement on applicable platforms and sale.

123. As a proximate result of Defendants' conversion of Plaintiffs' share of the net profits, Plaintiffs have been damaged and is entitled to an amount determinable at trial.

124. As a proximate result of Defendants' conversion of Plaintiffs' Finished Game, Plaintiffs have sustained actual and special damages. Special damages are required because (1) Plaintiffs were unable to market and collect money as a result of Defendants' conversion of the game; (2) Defendants knew that Plaintiffs would sustain lost profits, lose market visibility, allow for competitors to compete with the Game, and other

injuries as a result of the conversion; and (3) Plaintiffs could not have prevented the loss through the use of reasonable care.

125. Defendants' conduct in converting Plaintiffs' property was malicious and oppressive and constituted despicable disregard of Plaintiffs' rights and was intended to cause harm to Plaintiffs. Plaintiffs are therefore entitled to punitive and exemplary damages.

126. Unless the Court grants injunctive relief, Defendants will continue to convert Plaintiffs' property and cause Plaintiffs great harm and irreparable injury, monetary damages alone will not afford adequate relief. Accordingly, Plaintiffs seek preliminary and permanent injunctive relief.

**Count 11: Unfair Competition (California Business & Professions Code § 17200 et seq.)**

127. Plaintiffs incorporate paragraphs 1–126 as if fully set forth herein.

128. The acts and omissions of Defendants alleged in this Complaint constitute unfair business practices in violation of California Business & Professions Code § 17200 et *seq*.

129. Defendants' unlawful business practices include, without limitation, Defendants' conversion, breach of fiduciary duty, trade secret misappropriation, and other wrongs described herein.

130.  Defendants also unfairly interfered with Plaintiffs' ability to compete by misappropriating Plaintiffs' trade secrets and confidential information, converting and failing to turnover the Game, and diluting the value of Plaintiffs' Game and GHUL franchise.

131. This conduct was unfair because it offends established public policy and was immoral, unethical and unscrupulous.

132. Defendants have acted deliberately with the intent to unfairly benefit from the expense, time, effort and labor expended by Defendants in developing the Finished Game and its confidential intellectual property related thereto, and with callous disregard to Plaintiffs' rights.

133. As a result of Defendants' conduct, Defendants have been and will be unjustly enriched in an amount to be proven at trial, for which Plaintiffs seek restitution.

134. The unlawful and unfair business practices undertaken by Defendants have caused irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at law, and those unlawful business practices will continue to cause such irreparable harm unless restrained by this Court.

**Count 12: Accounting**

135. Plaintiffs incorporates paragraphs 1–134 as if fully set forth herein.

136. Plaintiffs and Defendants were involved in a financial relationship in which Defendants owed it a fiduciary duty due to its participation in the joint venture pursuant to the Agreements. Plaintiffs, in confidence, allowed Defendants to account for all debits and credits pursuant to the Agreements and distribute net profits accordingly.

137. A balance due from Defendants to Plaintiffs is only ascertainable through an accounting due to Defendants' complete failure to provide Plaintiffs with any accounting records, including the revenue reports, pursuant to the Agreements.

138. As a result, Plaintiffs request for the Court to compel Defendants to account to the Plaintiffs for any money due under the Agreements and all money collected or owed as a result of the sale and distribution of the Game.

## Count 13: Piercing the Corporate Veil

139. Plaintiffs incorporate paragraphs 1–138 as if fully set forth herein.

140. Plaintiff contends that Corporate Defendant, Maysalward, was the mere alter ego of Mr. Khrais, and the corporate veil should be pierced as a result.

141. Specifically, on information and belief, Defendant Nour Khrais exercises complete domination over Maysalward's finances, policy and business practices to such an extent that Maysalward has no separate mind, will or existence of its own.

142. On information and belief, Khrais and other Maysalward officers (if any) did not observe corporate formalities and the officers did not play a functioning role with respect Maysalward's operation at all relevant times to this complaint. Plaintiff did not speak, communicate, contact, meet or email any other member of Maysalward other than Nour Khrais during the relevant time period.

143. On information and belief, Khrais, as CEO and founder of Maysalward, treated Maysalward's bank account as his own, and siphoned funds for his own benefit and other business ventures.

144. The aforesaid control was used by Mr. Khrais to commit the actions complained of above, resulting in significant loss to Plaintiffs from his reckless and wasteful spending, diversion of funds, and loss of Plaintiff's net profits.

145. Maysalward operated as the alter ego of Mr. Khrais, and the corporate entity should be disregarded. Resultantly, Maysalward and Mr. Khrais should be treated as one and the same person for purposes of liability.

146. The fraudulent conduct committed by Mr. Khrais constitutes torts for which an officer of a corporation is individually liable. As such, sufficient grounds exist, in and of themselves, for disregarding the corporate form of MD and extending personal liability to Mr. Khrais for corporate obligations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a). Award general damages according to proof of trial, but in excess of the jurisdictional limits of this Court;

(b). Order a constructive trust to compel Defendants to deliver the Finished Game, all intellectual property at issue, and Plaintiff's Net Profits to Plaintiff;

(c). Award Plaintiffs attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a) and 17 U.S.C. § 505;

(d). Award Plaintiffs double damages for willful and malicious misappropriation of trade secrets pursuant to California Civil Code Section 3426.3;

(e). Issue an Order compelling Defendants to prepare an account of the money collected or owed as a result of the game distribution (and full disclosure of all books and bank accounts in the US and overseas);

(f). An Order establishing that Khrais is the alter ego of defendant and therefore personally liable for all damages in this case;

(g). Issue a writ of attachment freezing Defendants' bank accounts, Apple App. Developer Accounts, and Google wallet merchant accounts in an amount equal to the

amount of Plaintiff's Net Profits due under the Agreements;

(h). Issue a preliminary and permanent injunction enjoining Defendants, and each of their respective agents, servants, employees, representatives and all others acting in their behalf or in concert with them from: (a) marketing, selling, licensing, distributing or otherwise using, directly or indirectly, Plaintiffs' Game Concept, Code, or Trade Secrets derived from Defendant's unlawful use of the Game; (b) accessing, using, copying, publishing, disclosing transferring, selling or otherwise distributing, directly or indirectly, any of Plaintiffs' copyrighted material and any product incorporating or derived from all or part of Plaintiffs' copyright material;

(i). Issue a writ of attachment on Defendants' bank account(s), Google Play merchant account(s), and Apple App. Account(s) to prevent dissolution of funds related to Plaintiff's breach of contract and fraud claims;

(j). Award Plaintiffs pre-judgment and post-judgment interest; and

(k). Award any other and further relief, as the Court deems necessary, just and proper.

Dated:      March 18, 2014          Law Offices of Nate Kelly


                                    By: _____

                                    Nathaniel Kelly
                                    Attorney for Plaintiffs
                                    DreamStone Entertainment Ltd.
                                    Tigris Entertainment LLC


## DEMAND FOR JURY TRIAL

      Pursuant   to   Federal   Rule   of   Civil   Procedure   38(b),
Plaintiffs hereby demand a trial by jury of all issues triable
in this action.

Dated:      March 18, 2014          Law Offices of Nate Kelly


                                    By: _____

                                    Nathaniel Kelly
                                    Attorney for Plaintiffs
                                    DreamStone Entertainment Ltd.
                                    Tigris Entertainment LLC

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

DREAMSTONE ENTERTAINMENT LTD., AND
TIGRIS ENTERTAINMENT, LLC

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

MAYSALWARD, INC., a Delaware Corp.;
NOUR KHRAIS, an individual; DOES 1 -10,

**(b) County of Residence of First Listed Plaintiff** _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Nathaniel Kelly, SBN 262016
Law Offices of Nate Kelly,
9107 Wilshire Blvd., Ste. 450
(310)728-6215, ecoulre@natekelly.com

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☑ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☑ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☑ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☑ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☑ No    ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Breach of Contract: Plaintiff alleges Defendant breached a written contract for services. This court has subject matter jurisdiction over this action pursuant to diversity jurisdiction, 28 U.S.C. § 1332. The amount in controversy exceeds $75,000 exclusive of interests and costs and proper diversity exists between Defendants and Plaintiff

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | ☐ 370 Other Fraud | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 371 Truth in Lending | **OTHER** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 380 Other Personal Property Damage | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 385 Property Damage Product Liability | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | **BANKRUPTCY** | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 422 Appeal 28 USC 158 | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | **CIVIL RIGHTS** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☑ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 440 Other Civil Rights | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 441 Voting | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | | ☐ 448 Education | ☐ 790 Other Labor Litigation | |
| | | | | ☐ 791 Employee Ret. Inc. Security Act | |

**CV14-2063**

FOR OFFICE USE ONLY:    Case Number: _____

CV-71 (11/13)    **CIVIL COVER SHEET**    Page 1 of 3

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | INDICATE THE CITIZENSHIP OF THE U.S. AGENCY OR EMPLOYEE IS/ARE A: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | PLAINTIFF | DEFENDANT | |
| ☐ Yes  ☒ No | If the United States, or one of its agencies or employees, is a PLAINTIFF, then check the box below for the county in which the majority of DEFENDANTS reside. | If the United States, or one of its agencies or employees, is a DEFENDANT, then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | _Western_ |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

---

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**    _[signature]_    DATE:   3/18/14

---

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Christina A. Snyder _____ and the assigned
Magistrate Judge is _____ Suzanne H. Segal _____ .

The case number on all documents filed with the Court should read as follows:

## CV14-2063-CAS(SSx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of
California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

| | |
|---|---|
| March 18, 2014 | By  C. Sawyer |
| Date | Deputy Clerk |

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is
filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| ☒ Western Division | ☐ Southern Division | ☐ Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---